EXHIBIT
C

# United States Court of Appeals for the Fifth Circuit

No. 25-10491

United States Court of Appeals
Fifth Circuit
**FILED**
July 9, 2026
Lyle W. Cayce
Clerk

Equal Employment Opportunity Commission,

*Plaintiff—Appellee*,

Sarah Budd,

*Intervenor Plaintiff—Appellee*,

*versus*

SkyWest Airlines, Incorporated,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:22-CV-1807

Before Wiener, Haynes, and Graves, *Circuit Judges*.

James E. Graves, Jr.:

Sarah Budd worked for SkyWest Airlines at the Dallas-Fort Worth International Airport where she was subjected to extreme sexual harassment by her coworkers. She reported these incidents to her supervisor, but they continued. Eventually, Budd requested to go part-time because of the abuse and SkyWest began investigating the incidents. Concerned that the discipline meted out as a result of the investigation would not fix the issues, Budd

elected to take early retirement. The Equal Employment Opportunity Commission ("EEOC") filed suit on Budd's behalf.

At trial, the jury awarded Budd compensatory and punitive damages after finding that she had been harassed based on her sex and that SkyWest had failed to remedy the situation. SkyWest appeals, seeking a new trial based on evidentiary errors below, a new trial on compensatory damages due to an error in the jury instructions, and judgment as a matter of law on punitive damages. We affirm.

## I. Background

Sarah Budd worked as a Parts Clerk for SkyWest Airlines, eventually transferring to the Dallas-Fort Worth International Airport. While there, she was subjected to demeaning sexual comments from her coworkers. For example, maintenance supervisor Dallin Hansen asked her "if [she] liked whips and chains and leathers" and if so, she would "get along just great [t]here." Hansen continued making similar comments and sexual jokes towards Budd and would call her into his office to ask her personal questions. At one point, he suggested "tak[ing] her and sell[ing] her out there [so they could] make some money off of her." Budd understood him to be referencing the red-light district near the airport and implying that they should sell her as a prostitute.

Other employees followed Hansen's lead and made other innuendo-laden jokes and comments towards Budd. These included comments about sex positions, using lube, and rape. She discussed the harassment with her husband and told him about some of the comments in text messages.

Budd reported this to her supervisor, Dustin Widmer. She only met with him briefly and testified that he seemed primarily "annoyed." He told her that they would "see how it goes" because if he took any action, it would "just put a larger target on [her] back."

The comments continued and the harassment escalated. A coworker gestured to his crotch and told Budd he had a "good face cream" for her. Others would discuss how many women they would have sex with on road trips for the company. One employee said that "people that cry rape are just stupid. They just fucking want attention. That's all they want."

This caused Budd extreme emotional distress. She experienced vomiting, diarrhea, headaches, and nightmares, and committed self-harm, including slashing her arms with a box-cutter. She planned to commit suicide, but her husband found out and took her to seek medical treatment. She went on medical leave and began taking antidepressants.

When she returned to work, the situation had not changed. Her coworkers continued making sexual comments towards her and many openly viewed pornographic images on their computer screens while discussing how they would like to have sex with various women. At one point, one of the employees made a joke about raping a doll attached to a candy jar. One of her coworkers wrote a mock letter to Human Resources from the doll accusing one of the employees of rape and it became a running joke. She estimated that she heard the word "rape" approximately forty times that day. At her husband's insistence, Budd sent him a picture of the doll.

After this incident, she wrote a letter to SkyWest management asking to be put on part-time because of the "salacious environment" and noted that she had already complained of it. She followed up with Widmer and told him that, despite raising concerns about the harassment to him, "[i]t appeared that nothing was done or changed after this meeting and the environment only continues." Three days after sending the first request, she sent another after not hearing from management. Widmer responded and professed not to know that the harassment was going on. Budd did not go to

work the next day, but Widmer threatened to fire her if she did not come into work.

She complained to Human Resources and expressed her belief that Widmer's response was ineffectual. Kellie Dehais contacted her to investigate her complaints. After asking a few general questions, Dehais put her on paid administrative leave pending investigation.

As part of her investigation, Dehais would normally interview every witness, but this time she decided to randomly select interviewees. Witnesses described "sex talk" but Dehais did not follow up with them on what exactly that meant. Hansen told Dehais that he heard it and participated in it, but that he would stop it if it went too far. At the end of her investigation, Dehais ordered some of the employees involved to undergo additional training and gave written warnings. Neither Widmer nor Hansen received any discipline. Dehais did not contact Budd about the conclusion of her investigation.

Budd tried to follow up with Dehais who responded that she would tell Budd when she could come back to work. While Budd was on administrative leave, the COVID-19 pandemic forced SkyWest to offer early retirement to many employees, including Budd. She waited to hear from Dehais as long as she could but took the early retirement offer on the last day before the deadline because no one had been fired and she feared the environment would be the same.

The EEOC sued SkyWest under Title VII based on the harassment against Budd. After the trial, the jury concluded that Budd was harassed based on her sex and that SkyWest failed to take prompt remedial action. However, the jury found that SkyWest did not retaliate against Budd. The jury then awarded her compensatory and punitive damages. SkyWest moved for a new trial, or at least a new trial on compensatory damages, and for

Case 4:26-cv-00498 Document 24-1 Filed 07/09/26 Page 5 of 15



judgment as a matter of law on punitive damages. The district court denied these motions. SkyWest appeals.

## II. New Trial Based on Evidentiary Grounds

SkyWest first requests a new trial based on text messages it argues were erroneously admitted.

### A. Standard of Review

We review the denial of a motion for a new trial for abuse of discretion. *Montano v. Orange Cnty.*, 842 F.3d 865, 881 (5th Cir. 2016). "Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Jordan v. Maxfield & Oberton Holdings, L.L.C.*, 977 F.3d 412, 417 (5th Cir. 2020) (citation modified).

### B. Analysis

SkyWest argues that it is entitled to a new trial because the district court erroneously admitted Plaintiff's Exhibits 21, 23, 24, and 25. These exhibits are text message conversations where Budd discusses the alleged harassment and her feelings regarding it with others, including her husband and friends. SkyWest argues the messages are improper hearsay.

The parties spill much ink disputing whether the statements were made for the truth of the matter asserted. But even assuming arguendo that they were so offered, these messages are admissible as either a present sense impression or as statements regarding a mental or physical condition.

Taking present sense impression first, a statement is admissible when it is "describing or explaining an event or condition, made while or immediately after the declarant perceived it." FED. R. EVID. 803(1). When a statement describing an event is made immediately afterwards, "there is

almost no likelihood of a deliberate or conscious misrepresentation." *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 280 (5th Cir. 1991) (citation modified).

SkyWest takes particular issue with a text message where Budd told her husband "apparently . . . they're going to 'sell me' for prostitution." It argues that this "statement is really a claim about historical fact" and so does not fall under the present sense impression exception. But Budd testified that her text messages were "instant, realtime" communications describing events as they happened. So, this text message was admissible as a present sense impression. *See United States v. Polidore*, 690 F.3d 705, 720 (5th Cir. 2012) (concluding statement was admissible because the statements were made as the declarant "was observing [defendant]'s actions or shortly thereafter").

Other text messages that SkyWest objects to are similarly covered by this rule. For example, texts describing the outcome of a meeting with SkyWest Human Resources, describing events at her workplace, discussing activities she was performing or had recently performed, and meeting her new boss and telling him about the harassment. These all appear to describe events contemporaneously, so they are likewise admissible under this Rule.

Next, the remaining messages are admissible because they describe Budd's then-existing mental and emotional state, as well as the physical harm she suffered because of the harassment. "A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)" is admissible. FED. R. EVID. 803(3). But the declarant's state of mind must still be a relevant issue to allow such statements to be admitted. *Rock*, 922 F.2d at 279.

Whether Budd "subjectively perceived the harassment as abusive" is an element of her claim and therefore relevant to the case. *Wallace v.*

Case 4:26-cv-00418 Document 24-6 Filed 10/06/26 in TXSD Page 7 of 15



*Performance Contractors, Inc.*, 57 F.4th 209, 222 (5th Cir. 2023). And many of the rest of the texts fit squarely under this exception. She variously described her work as "awful," said she was "kinda in a funk," discussed how much she hated "these people if you can call them that," concluded that her workplace was taking a serious toll on her mental health, and told her husband how the stress manifested with physical symptoms, including stomachaches and vomiting.

So, the text messages are admissible and, even if some are not, they pertain to only part of the total evidence against SkyWest and so any error is not so prejudicial to "affect a substantial right." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 324 (5th Cir. 2004).

## III. Mitigation of Emotional Damages Under Title VII

SkyWest next argues that it is entitled to a new trial on damages because the district court failed to instruct the jury to limit compensatory damages for noneconomic loss, like emotional distress, based on Budd's failure to mitigate those damages. It argues that Budd could have taken steps to mitigate her mental and emotional damages by seeking therapy or taking medication.

### A. Standard of Review

"Jury instructions are reviewed for abuse of discretion." *Janvey v. Dillon Gage, Inc. of Dall.*, 856 F.3d 377, 388 (5th Cir. 2017). But "the legal conclusions underlying jury instructions are reviewed de novo." *Carter v. Loc. 556, Transp. Workers Union of Am.*, 156 F.4th 459, 478 (5th Cir. 2025) (citation modified).

### B. Analysis

The district court's jury instructions regarding compensatory damages did not include a section allowing or compelling the jury to consider

whether Budd failed to mitigate her damages for emotional distress. While this tracked the circuit pattern instructions, SkyWest argues it was in error.

A successful Title VII plaintiff "may recover compensatory" damages, including for noneconomic loss. 42 U.S.C. § 1981a(a)(1), (b)(3). These damages, however, do not include backpay, which is covered by a different provision that explicitly excludes the amount a plaintiff could have made "with reasonable diligence" to mitigate losses. *Id.* §§ 1981a(b)(2), 2000e-5(g)(1). The question, then, is whether the requirement that a plaintiff mitigate losses for backpay also applies to compensatory damages, or at least to damages for emotional distress. This appears to be an issue of first impression in our circuit.

We conclude that a plaintiff is not required to mitigate damages for emotional distress for two reasons. First, based on the statutory scheme Congress adopted, there is no textual requirement that a plaintiff must mitigate compensatory damages at all. Second, even if a plaintiff must mitigate some compensatory damages, that rule would not apply to emotional distress because there was no well-established common law principle that plaintiffs must mitigate damages for it.

**1. Statutory Text**

The fact that the statute includes a mitigation requirement for backpay, but not for compensatory damages, signals Congressional intent to exclude a duty to mitigate for compensatory damages. After all, "under the *in pari materia* canon of statutory construction, statutes addressing the same subject matter generally should be read as if they were one law." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 315–16 (2006) (citation modified).

SkyWest asserts that the *in pari materia* canon is inapplicable because § 1981a(b)(2) specifically excludes backpay from its definition of compensatory damages. But this ignores "the basic principle that courts

should read related bodies of law as a consistent and coherent whole." *Med. Imaging & Tech. All. v. Libr. of Cong.*, 103 F.4th 830, 837 n.2 (D.C. Cir. 2024). These statutes are undoubtedly related and "Congress legislates against the backdrop of existing law." *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) (citation modified).

And the absence of a duty to mitigate in § 1981a(b)(3) is highly suggestive that Congress did not intend to apply it to compensatory damages. After all, the "presence of . . . language in one statute [but] the absence [of it] in [another] statute" allows the court to infer that Congress intended not to include it. *Arif v. Mukasey*, 509 F.3d 677, 682 (5th Cir. 2007) (per curiam).

SkyWest argues that since the provision providing for compensatory damages was added in 1991, after the provision requiring mitigation for backpay, it is reasonable to assume that Congress would not have needed to insert a mitigation provision into the statute. *See EEOC v. SDI of Mineola, Tex., LLC*, 631 F. Supp. 3d 418, 422 (E.D. Tex. 2022). But "[a]textual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language[.]" *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019).

Without more, we see no reason to graft an absent provision—already present elsewhere—onto a statute where Congress did not put it.

**2. Well-established Common Law Principles**

SkyWest next argues that the duty to mitigate emotional damages is such a well-established common law principle that we must presume Congress meant for it to apply. But, while the duty to mitigate damages generally is firmly established in the common law, the duty to mitigate emotional damages specifically is not.

"[T]he touchstone of statutory" interpretation is Congressional intent. *United States v. Flores*, 135 F.3d 1000, 1003 (5th Cir. 1998). And "Congress is understood to legislate against a background of common-law adjudicatory principles." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). "Thus, where a common-law principle is well established, . . . courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." *Id.* (citation modified). But Congress is still not required to make a "clear statement, . . . [of] any intention to overcome the presumption's application to a given statutory scheme." *Id.* To determine whether a principle is well-established, the court must look to the common law as it existed when the statute was adopted. *Pasquantino v. United States*, 544 U.S. 349, 360 (2005).

Some courts have held that mitigation for emotional damages is not required. Nita A. Farahany, *The Costs of Changing Our Minds*, 69 EMORY L.J. 75, 91 n.75 (2019) (collecting cases). But others have come to the opposite conclusion. *Id.* at 94 n.97 (collecting cases). This demonstrates that "courts have shown some hesitancy in applying a duty to mitigate pain and suffering." Lars Noah, *Comfortably Numb: Medicalizing (and Mitigating) Pain-and-Suffering Damages*, 42 U. MICH. J.L. REFORM 431, 450 (2009). "The lack of authority and analysis results in large differences in" whether courts apply the mitigation defense to emotional distress. Eugene Kontorovich, *The Mitigation of Emotional Distress Damages*, 68 U. CHI. L. REV. 491, 501 (2001); *see also* Kevin C. Klein & G. Nicole Hininger, *Mitigation of Psych. Damages: An Econ. Analysis of the Avoidable Consequences Doctrine & Its Applicability to Emotional Distress Injuries*, 29 OKLA. CITY U.L. REV. 405, 416–24 (2004) (discussing the variety of approaches courts have taken to these arguments). This satisfies us that the common law

principle is not well-established now, let alone when the provision granting compensatory damages was adopted in 1991.

SkyWest, relying heavily on the district court opinion in *SDI*, essentially argues that the principle of mitigation of damages generally is firmly rooted in the common law. *SDI*, 631 F. Supp. 3d at 423. But that defines the common law principle far too broadly. *See V.I. Hous. Fin. Auth. v. FEMA*, 151 F.4th 409, 416 (D.C. Cir. 2025) (noting that the common law principle is only applicable if it "clearly applie[s] to the subject matter at hand" (citation modified)). The question is not whether well-established common law principles created a duty to mitigate damages, but whether that duty extended to emotional distress. It did not.

SkyWest cites numerous cases discussing mitigation of damages for emotional distress. But all the relevant cases were decided after § 1981a(b)(3) was adopted and so do not persuade us that the principle was well-established. *See Pasquantino*, 544 U.S. at 360. And even if they were relevant, as explained above, other courts have come to different conclusions.

Finally, the majority of federal courts answering this question have held that Title VII plaintiffs have no duty to mitigate damages for emotional distress. *See, e.g.*, *EEOC v. Chris the Crazy Trader Inc.*, No. 21-CV-02666, 2025 WL 958486, at *8 (D. Colo. Mar. 31, 2025) (noting that defendant's position is a minority one and supported only by *SDI*); *Castagna v. Luceno*, 558 F. App'x 19, 22 (2d Cir. 2014) (summary order); *Benson v. City of Lincoln*, No. 4:18CV3127, 2023 WL 6796391, at *16 (D. Neb. Oct. 13, 2023); *EEOC v. Fred Meyer Stores, Inc.*, 954 F. Supp. 2d 1104, 1128 (D. Or. 2013); *but see SDI*, 631 F. Supp. 3d at 422. We join the majority of courts and reject *SDI*'s approach.

There is no duty to mitigate emotional distress found in the text of § 1981a(b)(3) and SkyWest has failed to demonstrate that there was a

contrary common law principle that was well-established when that provision was adopted. So, the district court did not err by refusing to give SkyWest's proposed jury instruction.

## III. Punitive Damages

Finally, SkyWest argues that, because the jury found that it did not retaliate against Budd, the evidence is insufficient to support punitive damages and seeks judgment as a matter of law.

### A. Standard of Review

A court may grant a motion for judgment as a matter of law if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for" a party on a given issue. FED. R. CIV. P. 50(a)(1). We review denials of such motions de novo, but with heavy deference to the verdict, drawing inferences and making credibility determinations in favor of, and considering the evidence in the light most favorable to, the non-movant. *Wantou v. Wal-Mart Stores Tex., L.L.C.*, 23 F.4th 422, 431 (5th Cir. 2022). "As such, judgment as a matter of law should not be granted unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) (citation modified).

### B. Analysis

A Title VII claimant can receive punitive damages if the employer acted "with malice or with reckless indifference." 42 U.S.C. § 1981a(b)(1). This standard turns on the employer's state of mind, so the employer, or its agent, must know that it is violating federal law. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). That is, the "employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be

liable for punitive damages." *EEOC v. Boh Bros. Const. Co.*, 731 F.3d 444, 468 (5th Cir. 2013) (citation modified).

This is a higher burden than for establishing compensatory damages. *Wantou*, 23 F.4th at 439. And "even if particular agents acted with malice or reckless indifference, an employer may avoid vicarious punitive damages liability if it can show that it made good-faith efforts to comply with Title VII." *Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 302 (5th Cir. 2024) (citation modified).

**1. Malice or Reckless Indifference**

The EEOC argues that evidence supports the finding that three managers, Hansen, Widmer, and Dehais, acted with malice or reckless indifference sufficient to justify the punitive damages award. The district court concluded that the evidence was sufficient to support the finding that at least Hansen acted with malice or reckless indifference and did not analyze the evidence with regard to Widmer or Dehais. We agree.

There was ample evidence that Hansen not only knew about, but actively participated in, serious harassment against Budd. The jury also heard evidence that SkyWest employees—including Hansen—received sexual harassment training on a regular basis. This is sufficient to support the jury's finding.

SkyWest argues that there is only general evidence that employees completed harassment training, and no evidence that Hansen specifically received this training. This is true, but beside the point.

Dehais testified that all SkyWest employees received training regarding its sexual harassment policy when they were hired, promoted, and annually thereafter. And evidence is sufficient to show malice or reckless indifference if an employee receives training instructing them on the

company's harassment policy and relevant law, but the employee nevertheless engages in prohibited conduct. *See Wantou*, 23 F.4th at 440. Although there was no direct evidence that Hansen had received the training, Dehais' testimony that *every* employee received this training is enough to allow the jury to draw a reasonable inference that Hansen received the training. *See Roman v. W. Mfg., Inc.*, 691 F.3d 686, 699 (5th Cir. 2012).

The evidence was sufficient for a jury to conclude that SkyWest acted with malice or reckless indifference.

**2. The Good Faith Defense**

SkyWest can only escape liability for punitive damages by proving its Good Faith Defense.

An employer is not vicariously liable for its managerial agents if it makes good-faith efforts to comply with Title VII. *Kolstad*, 527 U.S. at 545–46. Even if an employer has "on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware." *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir. 2000).

The parties agree that SkyWest had an anti-discrimination policy, but dispute whether it was sufficiently enforced via Dehais' investigation. The EEOC points to evidence that Dehais failed to ask relevant follow up questions and interview witnesses. For example, one employee admitted to her that "[t]here is some sex talk in general but not as bad as some other places [she] worked" but Dehais failed to ask any follow up questions. She also failed to ask for pictures of the candy jar incident. And puzzlingly, Dehais chose to randomly select witnesses to interview. But perhaps most damaging, Dehais issued only written warnings to four employees and issued no disciplinary action against Hansen.

SkyWest claims that Dehais was unable to corroborate Budd's story, apart from the candy jar incident, which presumably led to the disciplinary actions (or lack thereof). But the jury was free to conclude that the deficits in her investigation reflected a feeble attempt to uncover the truth. *See Wantou*, 23 F.4th at 440 (concluding evidence was sufficient to conclude employer had not made good-faith efforts because at least some of his complaints were ignored). And the jury was free to disbelieve Dehais' testimony about the sufficiency of her investigation. *See EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 733 (5th Cir. 2007). Thus, these lapses were sufficient to allow the jury to infer that SkyWest had failed to make good faith efforts to comply with Title VII. *Cf. Harris*, 92 F.4th at 302 (concluding that employer had "conducted an in-depth investigation . . . [by] interview[ing] multiple witnesses, examin[ing] relevant evidence, and provid[ing] a detailed analysis of [the complainant]'s allegations").

Thus, at a minimum, there was sufficient evidence that Hansen acted with malice or reckless indifference and that Dehais' investigation was insufficient to meet the good-faith exception. So, the jury's verdict granting Budd punitive damages was proper.

## IV. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.